Filed 8/12/22 Gaurdianship of L.A.T. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| Guardianship of L.A.T. et al., Minors. | |
| PATRICIA R., | E076798 |
| Plaintiff and Respondent, | (Super.Ct.No. GARPS1900367) |
| v. | OPINION |
| GONZALO L., | |
| Movant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Tara Reilly, Judge. Reversed and remanded with directions.

Law Offices of Valerie Ross and Valerie Ross for Movant and Appellant.

Malcolm Cisneros, Arturo M. Cisneros and Brian S. Thomley for Plaintiff and Respondent.

Patricia R. petitioned to establish a probate guardianship of her minor granddaughter, A. Connie L. (Connie). The court appointed Patricia as Connie's guardian over the objection of Connie's father, Gonzalo L. Gonzalo appeals from that order.

Before any evidence was admitted at trial, the court erroneously indicated that the proceeding concerned Gonzalo's petition to terminate Patricia's guardianship of his daughter. Gonzalo and Patricia represented themselves in the trial court and did not object to the court's erroneous characterization. At the outset of the trial, the court informed Gonzalo that he carried the burden of persuasion on his petition and directed him to present his case first. After both parties presented their case, the trial court denied Gonzalo's supposed petition to terminate the guardianship but granted him shared physical custody and weekly visitation. Because the trial court mistakenly proceeded as if it were ruling on a petition to terminate a guardianship rather than a petition to create a guardianship, we reverse and remand for further proceedings.

BACKGROUND

In August 2019, Patricia petitioned for guardianship of her daughter's four children, including Connie, who was the youngest at three years old. Gonzalo is alleged to be Connie's father and not the father of Connie's three older half-brothers. The guardianship petition concerning Connie's half-brothers is not at issue in this appeal.

Patricia alleged that her daughter, the children's mother (mother), was mentally unstable, had become dangerous to herself, and was unable to provide food, clothing, and shelter for the children. The preceding month, Patricia served mother with a notice of

2

eviction. Patricia alleged that in July 2019 mother had been placed on a hold in a mental health institution.

In September 2019, Gonzalo objected to the guardianship, claiming that he had been a part of Connie's life from her birth and that he shared joint custody of Connie based on a mutual, nonjudicial agreement with mother.[1] He claimed that Connie had been living with him for the two months since Patricia evicted mother.

The same day that Gonzalo filed his objection, the court referred the matter to an investigator for investigation and a report.

At a hearing in March 2020, the court granted Patricia a temporary guardianship of Connie. Both Patricia and Gonzalo were present. The record on appeal does not include a transcript of that hearing. According to the court's order, Connie had been "staying with" Gonzalo. The record does not contain any information about how long Connie had been staying with him. On the basis of information contained in the court investigator's report (which is not included in the record on appeal), the court ordered Connie "returned" to Patricia's home. On its own motion, the court granted Patricia temporary guardianship of Connie, finding it to be in Connie's interest. The court also ordered Gonzalo to attend a 12-week parenting course. The court referred the matter to a court investigator for a supplemental report. The court granted visitation to Gonzalo from Mondays at 9:00 a.m. through Wednesdays at 5:00 p.m. The court ordered mother not to

---

[1] Mother also opposed the petition. Mother's objections were later dismissed because she failed to appear in court. Mother is not a party to this appeal.

3

have any unsupervised visits with Connie. For any visits with mother, the court ordered Patricia to be present.

A trial on the matter proceeded in January 2021. Gonzalo and Patricia represented themselves. Gonzalo stated that he was Connie's father, and Patricia stated that she was Connie's guardian.

At the beginning of the proceeding, the court asked Gonzalo if he had filed a petition to terminate the guardianship. Gonzalo responded, "I'm not too sure what that means." The court rephrased the question and asked, "You have filed a petition with the court asking the Court to terminate the guardianship so that [Connie] can come back and live with you; is that correct?" Gonzalo responded affirmatively, and Patricia indicated that she opposed Gonzalo's petition.

The court explained to the parties that the trial would proceed as follows: Gonzalo, "because you have filed the petition, you have what we call the burden of proof. That means you've got to convince the Court that I should terminate the guardianship. You need to convince me about 51 percent. You need to convince me that it would not be detrimental for [Connie] to be returned to living with you, and you need to explain to me why you would believe that is in her best interest." The court then informed Gonzalo that he would present his evidence first.

Gonzalo testified on his own behalf and called his father and sister as witnesses. Gonzalo lived with his parents. Seven people reside in the home. When Connie stays there, she shares a bedroom with Gonzalo.

4

Gonzalo testified that he loved Connie, had been in her life since her birth, and provided her with everything she needs, including food, clothing, and shelter. Gonzalo took Connie to her doctor's appointments. Gonzalo denied ever mistreating Connie or objecting to her seeing her brothers or Patricia. Gonzalo's sister and father corroborated that Gonzalo had never mistreated Connie. They also testified that he was a great father who was attached to Connie and provided for her, and to whom she was attached.

Gonzalo explained that he saw Connie every week starting at 5:00 p.m. on Monday through 5:00 p.m. on Thursday. Gonzalo helped Connie attend school online. Gonzalo worked mostly on weekends and on the days in which he did not have custody of Connie. If Connie lived with Gonzalo full time, his parents would care for her while he was away from home.

Gonzalo admitted to having a "very soft spot" for mother. He continued to interact with mother without Connie present. Gonzalo understood the court's previous order to mean that he could not see mother with Connie present. Gonzalo was aware that mother had been hospitalized sometime during the prior year because of her mental illness.

When Gonzalo and Patricia were at court in March 2020, mother entered Gonzalo's residence and took Connie away. Gonzalo contacted law enforcement to report that mother kidnapped Connie. Mother was waiting with Connie outside of the courthouse and returned Connie to Gonzalo.

Gonzalo admitted to having been involved in a physical altercation in 2017 with Patricia's son but claimed that her son had attacked him. Gonzalo denied that he had

5

returned to Patricia's son's residence later that day with friends to attack him. Patricia showed Gonzalo a video recording of the incident that was not admitted into evidence and is not included in the record on appeal.

The trial judge explained to Gonzalo that if she granted his petition and returned Connie to his care, she would nevertheless order that Connie spend "quite a bit of time with her siblings and" Patricia. Gonzalo said that he would agree to that arrangement. Gonzalo stated that he would do whatever he had to for Connie.

Gonzalo completed the parenting course ordered by the court. He started it later than ordered because of the COVID-19 pandemic.

Patricia testified that Connie had lived with her since birth. Initially, mother and Gonzalo lived with Patricia too. Patricia watched Connie when Gonzalo and mother went out. Patricia stated that although mother and Gonzalo lived in a bedroom in her home, Patricia provided Connie with a home and food, as well as financial and emotional support. Patricia purchased diapers and formula for Connie.

Connie is bonded with and loves her half-brothers, and they love and support her. All three of Connie's half-brothers have lived in Patricia's home their whole lives. Connie has her own bedroom at Patricia's house.

Patricia petitioned for guardianship solely because law enforcement had advised her that something had to be done because of the circumstances with mother and law enforcement's having been called to the property frequently. Patricia did not want Connie's children removed from her home and believed that she had no choice other than to seek guardianship.

Patricia believed that granting her petition for guardianship of Connie would be in Connie's best interest. Patricia was concerned that Gonzalo would not allow Connie to have a continued relationship with her siblings. That concern was based on "negative experiences" Patricia had with Gonzalo in the past. Patricia knew that Connie cared about her father, and Patricia did not believe that Gonzalo mistreated Connie. Patricia said that she would "always be receptive to [Connie] having a continued relationship with her father." Patricia expressed concern about Gonzalo not having good judgment, but she did not otherwise explain what she meant.

The trial judge asked the parties how the custodial arrangement had been working with Gonzalo having Connie Mondays through Thursdays and Patricia having her the remaining days. Patricia believed it had been working well.

At the conclusion of the first day's testimony, the trial judge indicated that it was clear to her that both Gonzalo and Patricia loved Connie and that they were both "eminently capable of caring for" Connie. The judge believed that each household provided Connie different advantages. Regardless of her ultimate decision on guardianship, which the judge indicated she had not yet made, the judge stated that she would ensure that Connie would be "spending a great deal of time with the other side." The judge recognized that Connie would be "spoiled" at either home and described the choice presented as involving "an embarrassment of riches in the two people that care for this little girl." The judge recommended that before the next day of trial the parties should consider agreeing to a shared custody arrangement that allowed both Gonzalo and Patricia to spend a lot of time with Connie.

Before trial started the next day, the judge did not ask the parties if they had reached any agreement concerning shared custody, and the parties did not indicate that they had. Patricia and Gonzalo both made closing statements. Patricia stressed to the court and to Gonzalo that the only reason she petitioned for guardianship was that she was told by law enforcement and by a social worker that she needed to do something, because otherwise Connie could be removed from her home as a result of law enforcement's having been called to her home so frequently in connection with mother's behavior. Patricia said that she had been concerned about Gonzalo's previous living situation but believed the situation had improved. She also believed that Gonzalo was more involved in the day-to-day caretaking of Connie. The only concern Patricia expressed was about "consistency and that it doesn't fall back to the way it was."

Gonzalo explained that he had been in Connie's life since she was born. It hurt him when he had to take Connie to Patricia's house and to explain to Connie that she could not stay with him longer. He reiterated that he had complied with the court's order to keep Connie away from mother and that he would continue to comply with any such future order. He said that he would stop talking to mother altogether if needed and would do whatever was necessary for him to be the best father to Connie.

The trial court ruled: "I am going to deny the petition to terminate the guardianship. I am going to leave—I am going to actually appoint [Patricia] as the guardian because we haven't actually gotten to that point yet, and let me explain why." The judge explained that she was concerned with Connie being able to continue to have a relationship with her siblings. With respect to Gonzalo, the judge was concerned about

8

the amount of people living in his residence and with the fact that he continued to have a "soft spot" for mother, which the court considered a "a bit of a dangerous thing." The court also found not credible Gonzalo's testimony about the altercation with Patricia's son.

The court expressed concern about mother's mental health issues. The court ordered that mother was allowed to see all of her children so long as the visits were "100 percent supervised." The court detailed a shared "custody/visitation schedule" between Patricia and Gonzalo, including holidays and school breaks, with Gonzalo having weekly custody of Connie from Monday at 5:00 p.m. through Friday after school while Connie attended school virtually. When school returned to in-person learning, Gonzalo would have Connie on weekends.

DISCUSSION

Before trial, the trial court indicated that the proceeding concerned Gonzalo's petition to terminate Patricia's guardianship of Connie, and the court ultimately denied that supposed petition. Gonzalo, however, did not file any such petition. He instead objected to Patricia's petition to establish a guardianship, which was the only petition pending before the court. We requested supplemental briefing about the effect of the trial court's mistaken belief that it was ruling on Gonzalo's petition to terminate a guardianship rather than Patricia's petition to establish a guardianship. We reverse and remand for further proceedings.

A nonparent may petition the court to establish a probate guardianship over a minor's person (Prob. Code, § 1510, subd. (a)), which the court may grant "if it appears

9

necessary or convenient" (Prob. Code, § 1514, subd. (a)). "When the court appoints a guardian, the authority of the parent 'ceases.'" (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1123 (*Ann S.*).) "The court has discretion to grant visitation [citation], but otherwise parental rights are completely suspended for the duration of a probate guardianship [citation]. The guardian assumes the care, custody, and control of the child. (Prob. Code, § 2351, subd. (a).)" (*Id.* at pp. 1123-1124.)

The Probate Code "specifies that the appointment of a guardian is governed by the Family Code chapters beginning with sections 3020 and 3040." (*Ann S.*, *supra*, 45 Cal.4th at p. 1123; Prob. Code, § 1514, subd. (b)(1).) (Undesignated statutory references are to the Family Code.) Section 3020, subdivision (a), declares that "when making any orders regarding the physical or legal custody or visitation of children," "'the health, safety, and welfare of children shall be the court's primary concern in determining the best interest of children.'" (*Ann S.*, at p. 1123.) Section 3040, subdivision (a), sets forth a legislative preference for parental placement. (*Ann S.*, at p. 1123.) The court nevertheless is afforded "the widest discretion to choose a parenting plan that is in the best interest of the child, consistent" with the statutory provision. (§ 3040, subd. (d); *Ann S.*, at p. 1123.)

Under section 3041, the court may grant custody (or guardianship) of a minor to a nonparent over the objection of a parent. (§ 3041, subd. (a); Prob. Code, § 1514, subd. (b)(1).) To do so, the court must "make a finding that granting custody to a parent would be detrimental to the child and that granting custody to the nonparent is required to serve the best interest of the child." (§ 3041, subd. (a).) In general, "a finding that parental

10

custody would be detrimental to the child shall be supported by clear and convincing evidence." (*Id.*, subd. (b).) However, "if the court finds by a preponderance of the evidence that the person to whom custody may be given" is a person who has assumed a day-to-day caretaking role of the child as statutorily described in subdivision (c) of section 3041, then that "finding shall constitute a finding that the custody is in the best interest of the child and that parental custody would be detrimental to the child absent a showing by a preponderance of the evidence to the contrary." (*Id.*, subd. (d).)

Subdivision (c) of section 3041 provides that "'detriment to the child' includes the harm of removal from a stable placement of a child with a person who has assumed, on a day-to-day basis, the role of the child's parent, fulfilling both the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time. A finding of detriment does not require a finding of unfitness of the parents." A showing of day-to-day caretaker status by a preponderance of the evidence (§ 3041, subds. (c), (d)) thus "creates a rebuttable presumption that it would be detrimental to place the child in the custody of a parent and the best interest of the child requires nonparental custody" (*H.S. v. N.S.* (2009) 173 Cal.App.4th 1131, 1137-1138; *Guardianship of Vaughan* (2012) 207 Cal.App.4th 1055, 1059).

"Unless ended by court order, the guardianship continues until the child 'attains majority or dies.' (Prob. Code, § 1600, subd. (a).)" (*Ann S.*, *supra*, 45 Cal.4th at p. 1124.) Probate Code section 1600 governs termination of a probate guardianship. Under that provision, "the court may make an order terminating the guardianship if the court determines that it is in the ward's best interest to terminate the guardianship."

11

(Prob. Code, § 1601.) The sole criterion considered by the court in terminating a guardianship is the child's best interest. (*Guardianship of L.V.* (2006) 136 Cal.App.4th 481, 490 (*L.V.*).)

Here, the only petition before the trial court was Patricia's petition to establish a probate guardianship over Connie's person. While that petition was pending, the court granted Patricia temporary guardianship of Connie, not permanent guardianship. To obtain permanent guardianship of Connie under section 3041, Patricia, as a nonparent, had to establish either (1) by clear and convincing evidence that granting custody to Gonzalo would be detrimental to Connie *and* by a preponderance of the evidence that granting custody to Patricia was in Connie's best interest, *or* (2) by a preponderance of the evidence, that Patricia had assumed the role of a day-to-day caretaker in Connie's life as described in subdivision (c) of section 3041, meaning that Patricia had assumed, "on a day-to-day basis," the role of being Connie's parent, fulfilling both her physical needs and her psychological needs for care and affection, and that she had "assumed that role for a substantial period of time." (§ 3041, subd. (c).) Either way, Patricia bore the burden of proof in the proceeding on her petition to create a probate guardianship of Connie.

Proceeding on the mistaken belief that Gonzalo had filed a petition to terminate Patricia's guardianship, the court instructed Gonzalo before any evidence was presented that because he filed the petition, he bore the burden of persuasion. The court told Gonzalo that he had to prove by a preponderance of the evidence (convince the court by "about 51 percent") that it would not be detrimental to return Connie to his custody and

that Gonzalo obtaining custody would be in Connie's best interest.[2] The court therefore erroneously shifted the burden of persuasion entirely to Gonzalo, which absolved Patricia of carrying any burden to establish the guardianship, contrary to the requirements of section 3041.

Because the court did not require Patricia to carry any burden of proof, the court never made the requisite findings under section 3041. The court never found by a preponderance of the evidence that Patricia was Connie's day-to-day caretaker under subdivision (c) of section 3041 and thus never found that Patricia had assumed that role by fulfilling Connie's physical and psychological needs on "a day-to-day basis" for a substantial period. Nor does it appear on this record that such a finding would be supported by substantial evidence.

When Gonzalo filed his objection to the petition in September 2019, Connie was living fulltime with Gonzalo. He attested that the arrangement began when mother stopped living with Patricia, which occurred in July 2019. The record contains no information about whether during this period Gonzalo assumed full financial and emotional responsibility for Connie.

The record contains scant evidence about the nature of the custodial arrangement before July 2019. Until then, Connie had always lived at Patricia's home. But mother

---

**2** By requiring Gonzalo to prove that it would not be detrimental to place Connie with him, the court applied the wrong standard even if it had been ruling on a petition from Gonzalo to terminate a guardianship because the sole criterion in considering such a petition is the child's best interest. (Prob. Code, § 1601; *L.V.*, *supra*, 136 Cal.App.4th at p. 491.) No finding of detriment need be made.

lived there too, and for some unspecified period after Connie was born, Gonzalo also lived at Patricia's house with mother and Connie. The record contains no evidence about when Gonzalo stopped residing at Patricia's house or whether and to what extent he contributed to Connie's care while he lived there. In his opposition to the petition, Gonzalo attested that sometime before mother's eviction from Connie's residence in July 2019 he and mother shared joint custody of Connie by mutual agreement. There is no evidence about the exact nature of that arrangement or when it began.

It thus appears that when Connie filed the petition for guardianship in August 2019, Gonzalo was Connie's day-to-day caretaker and that even before Patricia evicted mother in July 2019, Patricia may not have been providing for Connie's needs "on a day-to-day basis." (§ 3041, subd. (c).) Moreover, months later in March 2020, when the court found it to be in Connie's best interest for Patricia to be Connie's temporary guardian, Connie was "staying" with Gonzalo. The record on appeal does not contain any evidence about whether Connie had been staying with Gonzalo continuously from July 2019.

Then, after the court granted Patricia temporary guardianship in March 2020, Connie split her time between Gonzalo and Patricia through the time of trial in January 2021. For several days during the week (from Monday evening through Thursday evening), Connie stayed with Gonzalo. Thus, when the petition was filed and by the time of trial, there was not substantial evidence supporting a finding under subdivision (c) of section 3041 that Patricia had "assumed, on a day-to-day basis, the role of [Connie's] parent, fulfilling both [Connie's] physical needs and [Connie's]

14

psychological needs for care and affection," and had "assumed that role for a substantial period of time."

The court also did not make any findings about whether, as a nonparent who had not assumed a day-to-day caretaking role for Connie, Patricia had carried her burden under section 3041. It also appears on this record that Patricia could not carry her burden of demonstrating by clear and convincing evidence that it would be detrimental for Gonzalo to have custody of Connie. Such a finding would not be supported on this record by substantial evidence, particularly when taking into account the clear and convincing evidence standard that would have applied in the trial court. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) First, Patricia did not seek guardianship of Connie on the basis of any concerns about Gonzalo. Patricia emphasized that she instead had filed the petition because of her concerns about mother's mental health and because Patricia had been advised by law enforcement that she should establish a legally recognizable relationship with Connie to prevent Connie from being removed from her home on the basis of mother's issues. Second, there is no indication that Connie was mistreated or not well cared for while she was in Gonzalo's custody, either before or after Patricia was granted temporary guardianship. Third, the court indicated that it believed Gonzalo was "eminently capable of caring for" Connie, loved Connie, and might even "spoil" her. These findings by the court would undermine any finding that granting Gonzalo custody would be detrimental to Connie. Indeed, the court ultimately granted Gonzalo "custody/visitation" of Connie four days per week, which we presume the court would not do if it was concerned about Connie suffering any detriment

15

in Gonzalo's care. Fourth, the only potential basis for a finding of detriment was the court's concern about maintaining Connie's relationship with her siblings and about Gonzalo's having a "soft spot" for mother. As to the court's concern about Connie's relationship with her siblings, the record contains no evidence that Gonzalo would prevent Connie from maintaining her relationship with her half-brothers or Patricia. And there is affirmative evidence to the contrary. Gonzalo informed the court that he would allow Connie to see her siblings and Patricia. Moreover, there was no evidence that Gonzalo had allowed Connie to see mother when Gonzalo had custody of Connie several days per week after the court granted temporary guardianship to Patricia and limited mother's contact with Connie to supervised visits with Patricia. In addition, Gonzalo stated that he would abide by any court orders concerning visitation with mother and would cut off contact with mother completely, if necessary.

In sum, had the court ruled on Patricia's petition to establish a guardianship and applied the appropriate standards from section 3041, there would not have been sufficient evidence to support the necessary findings that Patricia assumed a day-to-day caretaking role for Connie or that placing Connie with Gonzalo would be detrimental to Connie.

We next analyze what effect the error had. We ask whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.) As we have explained, the record does not contain substantial evidence to support the findings that the court would have been required to make in order to grant Patricia's petition. Gonzalo therefore would have obtained a more favorable result but for the court's error.

16

DISPOSITION

The order is reversed, and the matter is remanded for further proceedings consistent with this opinion.  Gonzalo shall recover his costs of appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

CODRINGTON
Acting P. J.
RAPHAEL
J.